ADAMS, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CASE NO.    1:04CR98-001 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge John R. Adams |
| TANIA J. SIYAM, | ) | |
| | ) | SENTENCING MEMORANDUM |
| Defendant. | ) | |
| | ) | |

**I.  Introduction**

This matter is before the Court for the sentencing of the Defendant Tania J. Siyam.   On March 21, 2008, Defendant pled guilty to two counts of violating the Lacey Act by virtue of importing and selling raw ivory and pled guilty to two counts smuggling goods into the United States.

The Court ordered and received a pre-sentence investigation and Report related to the charges herein.   The Defendant has submitted numerous objections to the Report.   Those objections are addressed herein.

**II.  Advisory Guideline Calculations**

The base offense level for violations of 16 U.S.C. § 3373 and 18 U.S.C. § 545 is 6.   A 2 level enhancement is appropriate as the acts herein resulted in pecuniary gain and were part of a pattern of offenses.[1]   An additional 4 level enhancement is appropriate due to Defendant's status

---

[1] Defendant does not contest this finding.

as a leader of a group of five more individuals involved in a criminal enterprise.[2]  Finally, an enhancement is appropriate based upon the value of the raw ivory imported by Defendant.   The pre-sentence Report indicates that the value of the ivory exceeds $120,000, permitting a 10 level enhancement.   The Report also indicates that Defendant's Criminal History Category is I.   Based on these facts, the base offense level for each count in the indictment is 22.   The Report also declines to grant Defendant a three level deduction for acceptance of responsibility.   The Report, therefore, calculates the advisory guideline range on each count under these facts as 41 to 51 months imprisonment, 2 to 3 years of supervised release upon completion, a fine, and the appropriate special assessment.

## III.   Objections

Defendant has raised numerous objections to the Report.   The Court addresses each of those objections in turn.

### A.   References to the Defendant's father

The Report indicates that Defendant's father was imprisoned for 30 years for embezzling roughly $85 million dollars while serving as the General Manager of Ports for the Autonomous Port of Douala in Cameroon, Africa, the source of the ivory.   Given the fact that the ivory in question was transported from Cameroon, the Court finds this information relevant.   However, the fact that Defendant's father has a criminal history has not been used by the Court in determining the appropriate sentence for Defendant's crimes.

### B.  Refusal to grant deduction for acceptance of responsibility

Defendant next contends that the Report errs when it refuses to grant her a 3 level

---

[2] Defendant also does not contest this determination.

deduction for her acceptance of responsibility.  In support, Defendant contends that she has admitted to each of the acts that support the charges against her and has expressed remorse for her actions.  The Court finds this to be true.  However, Defendant has not admitted to all of the relevant conduct related to her offenses.  The Court finds that Defendant has falsely denied relevant conduct in this matter.

Application Note 1(a) to Sentencing Guideline § 3E1.1 provides that the following are appropriate considerations for determining whether a defendant has accepted responsibility:

> truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct).  Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a).  A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection.  However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility.

In the instant matter, Defendant claims that the three known sales (the California sale, the New York sale, and the Ohio sale) were her first and only sales of ivory.   The Court finds this assertion to lack credibility.

Defendant sent emails to a confidential information ("CI") during the Ohio sale.   In one email to the CI, Defendant stated as follows:   "I have been sending tusks for almost five years, much more regularly during the past 3.  Thus far, I have had ZERO seizures (proud of myself, I must admit – smile)."   In a phone conversation with the CI, Defendant stated that she purchased ivory from the "bush" by making regular trips in and out of that land.   In another email, this one to an undercover agent in New York, Defendant stated:   "For a couple of years now, I have been

using a particular packing/shipping method (and a few inside contacts) to deliver without problems."

In her objection to the Report, Defendant claims that the above statements were puffery, statements made only to induce the CI to trust her.   Defendant claims that she was reunited with her father in 2000 and that the reunification represented her first trip to Cameroon.   Defendant, therefore, concludes that it is not possible for her to have been smuggling ivory dating back to 1997.   The Court finds these assertions to be disingenuous.

The level of sophistication demonstrated by Defendant's smuggling operation undermines her assertion that the sales at issue were her first and only involvement with such an activity.   The ivory sales at issue here were sent from Cameroon to Canada and then to the U.S.   The ivory was sent first to Canada under Defendant's belief that it was easier to pass through customs in this manner.   Defendant also informed the CI that she did not like to ship through larger ports, such as New York City, because the security at the ports was more difficult to bypass.

This is also not a case in which Defendant simply placed raw ivory in an envelope and shipped it overseas.   The Report describes the first shipment to the Ohio CI as follows:

> The parcel contained two (2) terra cotta (pottery) sculptures, each of which was about 24 inches tall, and 5-6 inches in diameter.   After breaking off the Terra Cotta pottery outer shell, the raw elephant ivory tusks were revealed underneath.   Each sculpture (tusk) was individually wrapped with newspaper, and then covered with the terra cotta pottery substance, sculptured into a tribal art form, and then painted. The newspaper wrapping indicated it was parts of "The Cameroon Tribune" a Cameroon newspaper.

In addition to her dedicated efforts to conceal the ivory, Defendant also performed other actions which demonstrated her prior involvement in smuggling.   Defendant informed the CI that she did not want anything traceable to her following the purchase.   Defendant therefore informed the CI

4

to pay through Western Union as it provided the most anonymous method for payment. Defendant then instructed that payment be wired to Cameroon in the name of Jean Louis Ndema. Thereafter, the ivory was shipped under the name of M. Nsangou Aboubakar.

The Court also notes that Defendant was able to quickly acquire 125 pounds of ivory upon request from the CI.  Not only was Defendant able to acquire the ivory without a problem, she also informed the CI that she would need extra time to cut the ivory down to the size requested by the CI.  Defendant accomplished this feat within a few weeks of receiving payment from the CI.

Defendant was also quickly able to quote a price for the ivory that was requested, a price that included the average cost per pound to ship such items.  Finally, Defendant's smuggling operation included numerous individuals.  One female from Canada was needed to re-direct the shipments to the U.S.  Others that were involved included the following: one female from Pennsylvania, two males from Cameroon, an individual employed by a common carrier in Cameroon, and an artist to create the terra cotta sculptures.

It defies logic to conclude that the sales at issue herein were Defendant's first foray into smuggling.  The evidence in the Report demonstrates a detail-oriented, highly sophisticated smuggling operation.  Defendant was able to acquire large quantities of ivory, hide that ivory in African art sculptures, request payment be made to others, ship in the name of someone else, avoid detection by custom officials, and oversee at least five others.  None of these facts suggest that Defendant had no history of smuggling.  Rather, they directly contradict Defendant's assertion that she was new to such an endeavor.  The Court, therefore, finds that Defendant has falsely denied relevant conduct in this matter.   No reduction is granted for acceptance of responsibility.

**C.  Value of the Ivory**

Defendant contends that the value of the ivory that she shipped is inaccurate.   Defendant asserts that a value between $113,000 and $120,000 should be used.   The Court finds the value established by the Report to be exceedingly conservative.

Sentencing Guideline § 2Q2.1(b)(3)(A) provides as follows:

> If the market value of the fish, wildlife, or plants (i) exceeded $2,000 but did not exceed $5,000, increase by 1 level; or (ii) exceeded $5,000, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount[.]

In turn, § 2B1.1 allows for an 8 level increase if the value is in excess of $70,000 and a 10 level increase if the value is in excess of $120,000.

In calculating the value of the ivory, the Report used various figures.   Timothy Balda of NPT Systems / Ivoryworks Ltd. opined that the ivory was exhibition grade based upon his conclusion that it was recently harvested.   Balda then noted that the general price of ivory in 2002-2003 was $70 per cubic inch.   Based upon this data, the Report found the value of the ivory to be $158,294.85.   Lowering the quality of the ivory to premium grade, the value was reduced to $113,067.75.   Lowering the quality of the ivory even lower to average grade would result in a value of $101,760.98.   Another expert, David Warther, opined that the value of the ivory was $128,000.   In reaching its conclusion, the Report averaged Warther's value and Balda's exhibition grade value to reach a value of $143,147.42.   The Court finds this to be a reasonable method of valuation.   Moreover, averaging all four values given by the experts, the value of the ivory would be $125,280.90.

Defendant alleges that Warther and Balda were investigated by The Humane Society in

2002.   In a report issued by the agency, Warther is named and a company fitting the description of Balda's company is described.   The Humane Society Report indicates that both Warther and Balda expressed a willingness to engage in illegal purchases of banned ivory.   *See An Investigation of Ivory Markets in the United States*, available at www.hsus.org /web-files/PDF/Ivory_Trade_Report.pdf (last visited on May 1, 2008, on file with the Court). This report also indicated that Warther was the single largest purchaser of ivory in the United States.   Defendant contends that Warther and Balda may be seeking leniency in return for aiding in the preparation of the Pre-Sentence Report.   There is no indication that this is true.   While the allegations that Warther and Balda had and would willingly illegally purchase ivory, if true, would be disturbing and disheartening to the Court, such facts would only bolster their opinions on the value of such ivory.   That is, if Balda and Warther had purchased ivory illegally, their experience would serve as support for their ultimate conclusions with respect to the value of the ivory.

Finally, the Court notes that the value relied upon in the Report does not include the value of the elephants destroyed to harvest the ivory.   The first shipment to Ohio contained two tusks. The later Ohio shipments contained 41 tusk tips.   The first New York shipment contained 2 tusks and the second contained another tusk.   The California shipment contained two tusks.   Finally, these quantities do not include the ivory carvings and pieces of ivory included in the shipments, nor do they include the 169 elephant hair bracelets that were confiscated.   The Ohio shipments alone contained 161 pieces of ivory including the tusk tips.   From a conservative estimate, the shipments at issue contained 48 tusks or tusk tips.   Ignoring the evidence that at least two of the

tusks from one shipment were from different elephants,[3] Defendant's activities caused the death of at least 24 elephants, and likely many more.[4] John Lehnhardt, the Animal Operations Director for Disney's Animal Kingdom, indicated that he was aware of 5 sales of African elephants in the past six months.   The price for these animals ranged between $50,000 and $150,000.   Lehnhardt also indicated that over the past several years African elephants have been advertised for sale at between $75,000 and $125,000.   Taking the most conservative estimate of the value of the elephants and the number of elephants harmed would result in a destruction of wildlife of $1,200,000 (24 elephants multiplied by $50,000 per elephant).   If the Court were to accept this figure, Defendant's offense level would be increased by 16.   The Court, however, accepts the lower level of loss as contained in the Report.   The above analysis is presented to demonstrate the reasonableness of the figure reached in the Report.

### D.  Number of elephants harmed

In her objections, Defendant also asserts that the number of elephants harmed remains "a question of conjecture and it could be less" than contained in the Report.   It is entirely unclear as to how Defendant reaches her conclusions.   As detailed above, Defendant's ivory shipments contained a minimum of 48 tusks or tusk tips.   The Court cannot conceive of how these 48 tusks could represent less than 24 elephants.   African elephants grow only one set of tusks during their lifetime (the tusks are actually teeth).   As such, it is difficult to comprehend how Defendant could acquire 48 tusks without the death of at least 24 elephants.

The Court also notes that Defendant's contention that elephant hair bracelets can be made

---

[3] The Report indicates that based on the tusks involved, the 2 tusks were from different elephants.
[4] Defendant's specific challenge to the number of elephants harmed by her conduct is addressed below.

8

without harming other elephants is disingenuous under the facts presented.  While it is conceivable that the bracelets could be made without harming elephants, giving the activities engaged in by Defendant, the Court finds it unlikely that she refrained from harming elephants in her quest to sell jewelry made from their hair.  Given that Defendant's activities resulted in the deaths of numerous elephants, it strains logic to believe that she or someone at her direction somehow removed the hair from the tails of other elephants without harming them.  However, the Court notes that the Report does not conclude that any elephants were harmed from the making of the bracelets, and the Court has not made such a determination in reaching its sentence.

### E.  Criminal History

Defendant challenges one aspect of her criminal history.  Specifically, she asserts that the allegations that she once attacked a woman with a knife are false.  As these allegations never led to a conviction, the Court has not considered them in reaching its sentence.

### F.  Employment

Defendant apparently objects to the Report's note that she opened an art gallery in 2004-2005.  Defendant agrees, however, that the Report accurately reflects her income as $50,000 for 2004-2005.  To the extent that the Report references the art gallery, the Court has not relied on such a fact to reach its sentence.

### G.  Financial Analysis

Finally, Defendant asserts that the fact that she has retained three attorneys on her behalf should not be used against her.  Defendant, however, does not dispute the factual underpinnings of the Report.  While Defendant and her husband are both unemployed and receiving financial assistance from the Canadian government, she has been able to retain three attorneys.  The

9

Report, therefore, accurately depicts those facts.   The Court, however, did not take this fact into consideration when determining an appropriate sentence in this matter.   Defendant's counsel aptly explained how he became involved in the matter and the very minor fee that he accepted and split with co-counsel.   Consequently, Defendant's representation by three retained counsel was not a factor relied upon by the Court.

### H. Advisory Guidelines Conclusion

Having rejected each of Defendant's objections, the Court adopts the Report's initial determination of the advisory guideline range.   Prior to any departure or variance, therefore, the guideline range is 41-51 months for each count in the indictment.

## IV.   Departure and Variance

### A. Departure

There are no grounds for a downward departure.   There is, however, a substantial basis for an upward departure.   "If reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, an upward departure may be warranted." Sentencing Guideline § 4A1.3.   Furthermore, § 4A1.2(h) provides that "[s]entences resulting from foreign convictions are not counted, but may be considered under § 4A1.3."

Defendant's prior criminal history includes convictions for:   possession of stolen property (3 counts); theft of under $5,000 (4 counts); resisting and/or obstructing a police officer (1 count); failing to abide by the rules of her earlier release (1 count); and unlawfully importing an animal part (one count).   This final conviction resulted from the confiscated elephant hair bracelets above.   These convictions began in 1997 and ended on February 23, 2002.   These convictions

10

occurred in Canada and therefore were not counted in the Criminal History level detailed in the Report.   Based upon this information, the Court finds that Defendant's criminal history category substantially under-represents the seriousness of her criminal history.

Defendant appears to take issue with this analysis on the basis that none of Defendant's prior convictions were for serious offenses.   The Court disagrees.   When computing a criminal history category, three points are added for each prior sentence exceeding one year and one month. U.S.S.G. § 4A1.1(a).   Points are also added for lesser sentences.   Furthermore, a sentence that has been stayed in its entirety is counted as a prior sentence.   U.S.S.G. §4A1.2(a)(3).   According to the Report, Defendant received a two-year sentence on July 2, 1998, which was suspended. Additionally, Defendant was sentenced to 60 days in jail on June 16, 1997 and received a suspended 20 day sentence on January 30, 1998.   Each of these sentences would properly be counted if they had arisen in the U.S.   The Court, therefore, finds that an upward departure from the advisory guidelines is appropriate.   Defendant's criminal history category is determined to be Category II.   At this category and an offense level of 22, the advisory guideline range for each count in the indictment is 46 to 57 months.

§ 5K2.0 also permits an upward departure if any circumstance "is present in the case and has not adequately been taken into consideration in determining the applicable guideline range." Application Note 5 to § 2Q2.1 specifically provides that "[i]f the offense involved the destruction of a substantial quantity of fish, wildlife, or plants, and the seriousness of the offense is not adequately measured by the market value, an upward departure may be warranted."   The Court finds this provision to be applicable to the facts at hand.

As detailed above, the Report limits the value of the wildlife destroyed to solely the

11

confiscated ivory.   As the Court reviewed above, this value ignores the value of the elephants that were destroyed in Defendant's quest for financial gain.   This value undoubtedly far exceeds the number relied upon in the Report.

Defendant also contends that her actions did not result in the destruction of a substantial quantity of elephants.   Specifically, Defendant contends that without information detailing the elephant population, this Court cannot conclude that a substantial quantity of elephants was destroyed.   In support, Defendant attached a news report from 2003 that estimated the African elephant population to be between 400,000 and 660,000.   However, the International Union for the Conservation of Nature performed an elephant population study in 2002.   That study concluded that there were 17,241 African elephants in Cameroon.[5]   The Court finds the population of elephants in Cameroon is a more appropriate basis to evaluate Defendant's conduct. The report breaks down the population into Definite, Probable, Possible, and Speculative Populations.   The report indicates that there are definitely 2,006 elephants, probably an additional 3,058, possibly an additional 9,017, and speculatively another 3,160.[6]   Based upon the total of all these numbers, Defendant's crimes resulted in the death of more than one tenth of one percent of the entire elephant population in Cameroon (24 divided by 17,241).   These elephants have been listed as Threatened under the U.S. Endangered Species Act since May 12, 1978.   They have been listed under the Convention of International Trade in Endangered Species since 1997.   The Court finds that activities resulting in the destruction of roughly 1/1000 of the entire African elephant

---

[5]  *See* Blanc, J.J. et al., *African Elephant Status Report 2002,* available at
http://www.iucn.org/themes/ssc/sgs/afesg/aed/aesr2002.html (last visited May 2, 2008, on file with the Court).
[6]  The Court notes that the definite number of elephants in Cameroon has dropped to 179 in the 2007 Status Report prepared by the same organization and available on the same web page.

population in Cameroon satisfy the substantial quantity requirement needed to support a departure.[7]

The Court, therefore, concludes that an upward departure is warranted to adequately measure the quantity of wildlife destruction resulting from Defendant's actions. Based on this finding, the Court departs upward four levels, raising Defendant's offense level to 26. Based upon this offense level, the advisory guideline range is 70 to 87 months.

**B. Variance**

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in exercising its judgment to determine an appropriate sentence and must offer a reasoned explanation for the sentence. Based upon those factors, the Court finds than an upward variance is appropriate under the facts presented in this matter.

In reaching its conclusion, the Court must consider the nature and circumstances of the offense and the history and characteristics of the defendant. The Court must also review the need for the sentence imposed: a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; b) to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the Defendant; and c) to provide the Defendant with needed educational or vocational training, medical care, and/or other correctional treatment in the most effective manner.

Defendant's conduct was egregious. Her selfish financial motivation resulted in the deaths of countless animals. Testing of a sample of the ivory revealed that 4 of the 6 tested pieces came from elephants younger than 12 years old. Left to nature, these elephants can live to be

---

[7] This would be the proportional equivalent of destroying over 70,000 of the dogs living in the United States.

13

nearly 60 years old.   Glennon, Michael J., *Has International Law Failed the Elephant?*, 84 Am. J.

Int'l Law 1, 1 (1990).   Moreover, the death of one elephant can have a dramatic impact on other

elephants.

> Elephants have a haunting sense of death. When a member of the family dies, they
> touch the carcass gently with their trunks and feet, and cover it with loose earth and
> branches. They do not react to the remains of other species but are fascinated by
> those of their own:

> When they come upon an elephant carcass they stop and become quiet and yet
> tense.  First they reach their trunks toward the body to smell it, and then they
> approach slowly and cautiously and begin to touch the bones, sometimes lifting
> them and turning them with their feet and tusks. They run their trunk tips along the
> tusks and lower jaw and feel in all the crevices and hollows in the skull probably
> trying to recognize the individual.

> Observers noticed one 7-year-old male lingering at such a site long after the others
> had gone, "repeatedly feeling and stroking the jaw and turning it with his foot and
> trunk."  It was the remains of his mother.  Females whose calves have died have
> seemed lethargic and depressed for many days afterwards. When the matriarch
> dies, the entire family can disintegrate, its former members seemingly becoming
> a-social and aggressive.

*Id.* at 2 (citations and alterations omitted.)

There is unquestionably a massive underground market for ivory which has resulted in

widespread poaching.   Glennon's article details these statistics, but also serves to demonstrate the

brutality involved in obtaining ivory.

> Numbers, however, do not tell the whole story.  They do not convey the brutality
> of the killing, sometimes by paramilitaristic poachers who spray bullets from
> semiautomatic weapons over entire herds.   They do not disclose the horror burned
> in the memories of [surviving elephants] that have witnessed the hacking of parents
> and siblings they have lived with for decades and afterwards wander aimlessly in
> despair. Numbers - and dispassionate references to "ivory" and "offtake" - do not
> reveal what really is at issue:

> The word ivory disassociates it in our minds from the idea of an elephant.   One
> tends to lump it with jade, teak, ebony, amber, even gold and silver, but there is a

major difference:   The other materials did not come from an animal; an ivory tusk is a modified incisor tooth.   When one holds a beautiful ivory bracelet or delicate carving in one's hand, it takes a certain leap of understanding to realize that piece of ivory came from an elephant who once walked around using its tusk for feeding, digging, poking, playing and fighting, and furthermore that the elephant had to be dead in order for that piece of ivory to be sitting in one's hand.

Every 10 minutes, another elephant is slain and its tusks wrenched or cut from its face by poachers intent on delivering more ivory to the marketplace.

*Id.* at 4.   (citations and quotations omitted).

As Glennon has observed, elephants are not unlike humans in exhibiting grief at the loss of a family member.   Defendant's actions have contributed to inflicting this anguish on a countless number of elephants throughout Cameroon.   While Defendant herself may not have been personally involved in the poaching, creating the market for such an activity only serves to encourage those engaged in the activity.   "Kenya's President Moi put it well: 'To stop the poacher, the trader must also be stopped[.]'"   *Id.* at 37.

The Pre-Sentence Report also contains information gleaned from Dr. Richard Ruggiero, Ph.D., an employee of the U.S. Fish and Wildlife Service.   While Defendant claims that Ruggiero's analysis is biased due to his affiliation with the Government, the Court finds that many, if not all, of Ruggiero's conclusions are based upon common sense, rather than a particular expertise related to African elephants.   The Court, therefore, finds Ruggiero's conclusions appropriate.   These observations make it clear that the impact of the deaths of these elephants will have a trickledown effect on the African ecosystem.

As large mammals that range through wide areas of Africa, elephants create paths and trails through dense brush and forest.   These paths and trails then serve to allow smaller animals to travel to parts of the continent that they could not otherwise access.   The elephants' size also

15

allows them to knock down trees and other vegetation to open the forest canopy.   This opening permits further growth of low-lying vegetation.   Further, through their massive intake of vegetation, elephants serve to disperse seed across the land they traverse.   Dr. Ruggiero noted that it is believe that some tree species are believed to be uniquely dispersed by elephants.

By slowly eliminating elephants, their trails will become grown over.   Smaller animals will no longer be able to travel the forest, limiting their ability to feed and survive.   Vegetation growth could be reduced and it is possible that some tree species could be eliminated.   As a result, the continued poaching of elephants could have a dramatic effect on the African landscape.

Also telling is Defendant's own letter in which she purports to accept responsibility for her conduct:  "In selfish pursuit of financial gain, I chose to remain ignorant of the horrors of illegal poaching – willfully blind to the plight of its endangered victims.   Only when faced with prosecution did I seek to educate myself[.]"

The charged conduct in this matter will have repercussions in Cameroon for years into the future.   This says nothing of the harm caused by the five years of smuggling ivory that Defendant alluded to in her emails to the CI.   The Court, therefore, finds that the nature and circumstances of this offense are not adequately reflected by the advisory guidelines.

The Court also finds that a stiff sentence is required to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, and to afford adequate deterrence.   As detailed above, the elephant population in Cameroon continues to decline.   Absent a sentence that demonstrates that trading in illegal ivory will not be tolerated, this species faces the very real threat of extinction.

The Court is also aware that the plea agreement indicates that Defendant will not face

16

prosecution for her shipments of ivory into New York.   The Court, therefore, also considers these criminal acts for which a sentence will not be formally imposed.

In reaching its decision, the Court is also cognizant of the history and characteristics of Defendant.   Defendant is a 32 year old citizen of Canada.   At the time of sentencing, Defendant had recently given birth to her fourth child.   Prior to her arrest, she was the primary caregiver for 2 of her 3 children, with the third child residing with his step-mother in Cameroon.   Based upon her family, Defendant presents in a sympathetic light.   There is little question that any lengthy term of imprisonment will cause emotional harm to Defendant, her older children, and her recently-born child.   However, any sympathy generated by these facts is substantially negated by the nature of the crimes detailed above.

The Court, therefore, finds that a 3 level upward variance is supported by the facts presented.   The Court, however, has not imposed that variance based upon its review of similar sentences.

## V.  Kinds of Sentences Available

The final calculated advisory guideline range of imprisonment is 70 to 87 months.   The maximum statutory penalty for each count is 5 years imprisonment, a $250,000 fine, and 3 years of supervised release.

## VI.  Sentencing Disparities

In her objections, Defendant asserts that a 30 month sentence must be imposed to avoid sentencing disparities.   In support, Defendant cites to four defendants who were sentenced for somewhat related crimes.   Richard Bobbo was sentenced by the United States District Court for the Northern District of Illinois to two years of probation for his crimes.   Bobbo had plead guilty

17

to smuggling one leopard skin, three dwarf crocodile skins, four ivory statues, and seven strands of ivory beads into the U.S.   In addition, Bahoreh Kabba was convicted of smuggling 66 pieces of ivory into the U.S. in the District Court for the Central District of California.   Kabba received a sentence of one year and one day in prison.   Oumar Keita was convicted of smuggling 57 ivory carvings into the U.S. in the District Court of the Eastern District of New York.   Keita received a sentence of 11 months and 10 days.   Keita's smuggling technique, wrapping the ivory in what appeared to be stone carvings, was compared to the technique used by Bayo Namory, another smuggler sentenced to a year and a day in prison.   Finally, Defendant points to the sentences received by Kim Johnson and Virginia Smith in the District Court for the Eastern District of Pennsylvania.   Johnson and Smith were convicted of smuggling tusks and numerous other pieces of wildlife.   Johnson received a sentence of 5 months, while Smith was placed on probation. Defendant concludes that her plea agreement recommended sentence of 30 months is, if anything, harsh as compared to similar defendants.

The Court, however, finds Defendant's conduct to be more closely related to the Defendant in *U.S. v. Silva*, 122 F.3d 412 (7th Cir. 1997).   Silva was convicted of smuggling protected parrots into the U.S. over a five year period along with filing a false tax return.   The trial court concluded that Silva was the ringleader of the smuggling operation and imposed a total sentence of 82 months imprisonment.   Like Defendant, Silva attempt to argue that his status as a smuggler had been greatly exaggerated.   Like this Court, the district court rejected that argument when imposing sentence.   While Silva's sentence included his conviction for filing a false tax return, this Court finds his conduct to be less egregious.   Silva smuggled live animals into the U.S.   In contrast, Defendant smuggled ivory into the country that was gained through the slaughter of numerous

18

elephants.

In the Court's view, Defendant's convictions present a unique set of circumstances. Bearing in mind the sentences received by those who are in some manner similarly situated, the Court determines that a sentence of 60 months is appropriate. Defendant's acts are more calculated than those who received lesser sentences. As detailed above, the Court finds that Defendant engaged in smuggling for at least five years. She recruited at least five individuals to assist in her operation. She learned customs laws and put in place methods to reduce her risk of being discovered by the authorities. She displayed pride in the fact that she had eluded detection for such a long period of time. Finally, she remained willfully blind to the effect her actions had on the African ecosystem. The Court, therefore, finds that a sentence more similar to that received by Mr. Silva (82 months) is more appropriate than the sentence suggested by Defendant (30 months).

## VII. Conclusion

Based upon the above reasoning, pursuant to the Sentencing Reform Act of 1984 and 18 U.S.C. § 3553, it is the judgment of the Court that the Defendant Tania J. Siyam is hereby committed to the Bureau of Prisons for a term of 60 months. The Court notes that this sentence is below the advisory range calculated by the Court following two upward departures. This sentence was chosen to avoid sentencing disparities.

The Court notes that it would have imposed this sentence utilizing the factors contained in § 3553, even absent any upward departure or if even if had accepted Siyam's proposed ivory valuation. That is, the Court would have varied upward from the original advisory guideline range even if it had not departed upward or had accepted a starting range lower than the Court's

19

ultimate conclusion.   Siyam therefore is sentenced to the following:   a term of 60 months, which is the statutory maximum for Counts I and II, violations of the Lacey Act; and a term of 60 months, which is the statutory maximum for Counts III and IV, smuggling.   These sentences are to run concurrently.

Defendant is fined $100,000, and she must pay to the United States a special assessment of $400, which shall be due immediately.

The Court notes that the parties' plea agreement recommended a sentence of 30 months. Based upon the Court's review of the facts of this matter, such a sentence is simply too low. While the penalty imposed by the Court is twice that recommended in the plea agreement, the Court does not deem the penalty to be imposed harsh.   Rather, the Court has determined that 60 months is sufficient, but not greater than necessary, to fulfill the purposes of sentencing.


IT IS SO ORDERED.

_____August 14, 2008_____          _____/s/John R. Adams_____
Date                                   JOHN R. ADAMS
                                       UNITED STATES DISTRICT JUDGE